IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JOHN HOLMQUIST, <br><br> Plaintiff, <br><br> vs. <br><br> TYSON FRESH MEATS, INC., <br><br> Defendant. | **7:18CV5003** <br><br> **MEMORANDUM AND ORDER** |

This matter is before the Court on defendant Tyson Fresh Meats, Inc.'s ("Tyson") motion for summary judgment (Filing No. 60). This is an action for disability discrimination, failure to accommodate, and retaliation under the Americans with Disabilities Act, ("ADA"), as amended by the Americans with Disabilities Amendments Act of 2008 ("ADAA"), 42 U.S.C. § 12112, *et seq*.

I.  BACKGROUND

The plaintiff, a production supervisor at a packinghouse, alleges he was unlawfully suspended and terminated after he requested an accommodation after spinal fusion surgery. He also alleges that Tyson failed to accommodate him and retaliated against him for requesting the accommodation. The defendant denies the plaintiff's allegations and states it had a legitimate, nondiscriminatory reason for the termination—failure to follow attendance and call-in instructions. Further, it asserts that the requested accommodations, to the extent they were made, were unreasonable and would have placed an undue burden on Tyson.

Tyson moves for summary judgment on all the plaintiff's claims. It first argues that undisputed evidence shows that the plaintiff cannot prove any discriminatory animus. It

1

next asserts that the plaintiff's failure-to-accommodate and retaliation claims fail because there is no dispute that the plaintiff was informally accommodated on his return to work after surgery. In response, the plaintiff argues there are genuine issues of material fact that preclude summary judgment.

I.  FACTS

The following facts are gleaned from the parties' respective statements of undisputed fact and from the evidence submitted in connection with this motion. Filing No. 62, Def's Brief at 2-20; Filing No. 68, Plaintiff's Brief at 2-7; Filing No. 75, Defendant's Reply Brief at 6-18; Filing Nos. 63, 67, and 76, Indices of Evidence. The plaintiff began working at Tyson's Lexington, Nebraska meat packing plant in approximately August 2013. He was initially hired to work as an Assistant Supervisor on the B shift, which ran from 1:30 p.m. to 4:30 a.m. Tyson's records indicate that he reported back pain in December 2015. Filing No. 67-2, Health Service Records, Medical Narrative at 3. He was sent home by the nurse for severe pain in the lumbar area of his back and told to return with a doctor's note. *Id.* He returned to work on December 21, 2015 with restrictions on heavy lifting, pushing and pulling until his follow-up doctor's appointment.

On Jan 30, 2016, Holmquist had L4-L5 spinal fusion surgery. He took a personal leave of absence from January 25, 2016 to March 7, 2016. He was released to work with initial restrictions of no bending, twisting or lifting more than 10 pounds. Filing No. 61-1, Ex. V, Holmquist Statement at 3. He then applied for and was ultimately hired for the position of assistant supervisor on the A shift. Filing No. 63-35, Declaration of Marcia Washkun, ("Washkun Decl."), Ex. A, Deposition of John Holmquist ("Holmquist Dep.") at 74, 78. He was interviewed for the position by Kurt Olerich, the A Shift Superintendent.

*Id.* The plaintiff testified that when he applied for the A shift position, he informed Olerich about the back surgery. *Id.* at 78. Holmquist's supervisor was Juan Sanchez, Shift General Foreman, who reported to Olerich. *Id.* at 90. Mark Sarratt was the Complex Plant manager, with authority to hire and fire employees. Filing No. 63-28, Declaration of Mark Sarratt ("Sarratt Decl.") at 1. Dave Roemmich was the Slaughter Operations Manager. Filing No. 63-35, Washkun Decl., Ex. A, Holmquist Dep. at 90. Holmquist states that on the first day of work on the A shift, he informed Sanchez and Olerich of his restrictions, his course of recovery, and his need for doctor appointments once a month. Filing No. 67-1, Ex. V, Holmquist Statement at 4.

The defendant presented evidence that its employees receive training during orientation and early in their employment that includes, among other things, information regarding Health Services,[1] workplace harassment and discrimination, attendance, rules of conduct, and how to report work injuries. Holmquist acknowledged that training and understood that the rules of conduct applied to him as a supervisor. He had been provided with the attendance policy applicable to his employment at Tyson. He also understood that he was to provide proper notification of absences and tardiness. As a supervisor on any shift, plaintiff was required to be at work early every day, before the meat-processing chain started, for a management meeting. Under the company's absence procedure, a team member was required to "notify his/her supervisor at least

---

[1] Health Services is responsible for Human Resources tasks and functions at the Plant, including maintaining health records in employee medical files, receiving employee-related medical documentation for occupational and non-occupational illnesses or injuries, administering Tyson's Hourly Attendance Policy, maintaining documentation of any medical restrictions and absences necessitated by medical conditions or due to an employee's need to see a medical provider. If an employee receives medical documentation from his or her medical provider that outlines work restrictions related to a non-occupational injury, the request is to be provided to Health Services, but the Human Resources Department determines whether the restrictions can be accommodated. *See* Filing No. 63-23, Declaration of Bobbie Samoya ("Samoya Decl.").

30-minutes prior to the team member's start time of any absences or tardies." Filing No. 67-8, Ex. CC, Attendance Policy at 1.  Points were assigned for various types of absences, resulting in corrective action.  *Id.*  The accumulation of fourteen points would result in termination.  *Id.*  Holmquist also testified that supervisors were expected to "cover" for production line employees who were absent or on a bathroom or prayer break. Filing No. 63-35, Washkun Decl., Ex. A Holmquist Dep. at 46-51.

Tyson's ADA Accommodation Policy states that the company would engage in an interactive process with an employee on a request for a reasonable accommodation. Filing No. 67-10, Ex. EE, Tyson ADA Accommodation Policy.  The Policy provides: "At no time will a final decision to deny a requested reasonable accommodation be made without exhausting the interactive and collaborative process with the respective location HR, Occupational Health/Nursing Department, Director of HR Operations, the Employment Compliance Department, and the Legal Department, as circumstances dictate." *Id.*  The plaintiff does not dispute that he received certain accommodations, after providing Health Services with a doctor's note, while he was employed at Tyson.  He was once excused from working in the cold because of his asthma; he had been limited in bending, twisting and lifting certain weights, and had been allowed to wear a boot at work. Filing No. 63-23, Declaration of Bobbie Samoya ("Samoya Decl.") at 3; Filing No. 63-25 to 63-27, Exs. B, C, and D, Health Services Job Activity Notification Forms; Filing No. 63-35, Washkun Decl., Ex. A, Holmquist Dep. at 267-69.  He also provided a doctor's notes to excuse absences.  Filing No. 63-23, Samoya Decl. at 4.

The plaintiff contends that Tyson failed to accommodate him by directing him to perform work that exceeded his restrictions.  He states that on his third day of work he

4

was told to do a job on the line that exceeded his weight restriction and declined to do it. Filing No. 67-1, Ex. V, Holmquist Statement at 6-7. Plaintiff's supervisor, Dave Roemmich, did not recall if he directed the plaintiff to do that job. Filing No. 67-3, Ex. X, Deposition of Dave Roemmich ("Roemmich Dep.") at 32, 35. Holmquist states Juan Sanchez was disappointed in Holmquist's refusal. Filing No. 67-1, Ex. V, Holmquist Statement at 4. Holmquist later spoke to Mark Sarratt about the restrictions. *Id.* He testified that on or about May 19, 2016 he was ordered to assist in carrying a number of trolleys that cumulatively violated his weight restriction. Filing No. 63-35, Washkun Decl., Ex. A, Holmquist Dep. at 144-46, 161-62, 320; Filing No. 67-1, Ex. V, Holmquist Statement at 3-4. Holmquist also testified that he was aware of another supervisor who had been excused from having to perform production duties on the line and was placed on light duty after surgery. Filing No. 63-35, Washkun Decl., Ex. A, Holmquist Dep. at 168-71.

The plaintiff also recounts several incidents in May 2016, wherein he contends that his supervisors, Juan Sanchez and Kurt Olerich made derogatory comments about his restrictions and inability to perform strenuous work. Filing No. 63-39, Washkun Decl., Ex. A, Holmquist Statement Excerpt at 4-5. Olerich reportedly referred to the plaintiff as "a pussy" on May 12, 2016 for refusing to do heavy lifting due to his back, and during the week of May 27, 2016, Olerich reportedly told the plaintiff he did not care about the plaintiff's restrictions. *Id.*

The record shows the plaintiff had been disciplined several times over the years. He received a warning for failure to provide a hearing test and disciplined twice for missing mandatory meetings. Filing Nos. 63-12, 63-13, 63-14, 63-15, Declaration of Suzann

Reynolds, Exs. K, L, M, and N, Disciplinary Action Notifications.  The record shows Tyson accepted doctor's notes after the fact to excuse absences.  Filing No. 63-24, Samoya Decl., Ex. A, Health Services Narrative.  There is no record of points assessed against Holmquist for the absence policy infractions.

Plaintiff disputes that he failed to communicate his absences and tardiness to the defendant.  Filing No. 67-1, Ex. V, Holmquist Statement at 8.  The record shows the plaintiff had a medical appointment on June 14, 2016, and was thereafter restricted from bending, twisting, or lifting over 50 pounds.  Filing No. 67-5, Ex. Z, Doctors' notes.  An e-mail from Dave Roemmich to Suzanne Reynolds on June 14, 2016, first states that Holmquist was a "no show, no call" that day, but later states Holmquist arrived late.  Filing No. 63-16, Reynolds Decl., Ex. O.  Roemmich did not request documentation by Human Resources and stated Holmquist was told to bring doughnuts the following day.  *Id.*  Tyson records show that Health Services was presented with a note showing the restrictions and documenting the appointment dated June 14, 2016, on July 15, 2016, and notes indicate that the ADAA accommodation was approved by Human Resources.  Filing No. 67-2, Ex. W, Health Services Narrative at 3.

On July 28, 2016, Kurt Olerich e-mailed Dave Roemmich and Suzanne Reynolds that "[o]n 7/27/16 John Holmquist showed up for the morning meeting at 5:20am,  which is late . . . I would like a discipline sent."  Filing No. 63-18, Ex. Q, E-mail.  Reynolds responded to Roemmich, "So an unexcused tardy you think?" and Roemmich replied "I told Kurt would allow for him being late one morning nothing else health related."  *Id.*

The plaintiff contends he provided notice to his supervisors that he would be going to the doctor on August 9, 2016.  Filing No. 67-1, Ex. V, Holmquist Statement at 7.  He

6

also contends he had informed Juan Sanchez that his back pain had increased and that he was likely going to need to reduce his hours at work. *Id.* at 8. An e-mail dated August 9, 2016 indicates that Juan Sanchez was aware by way of a text message that Holmquist had an appointment that day. Filing No. 63-19, Reynolds Decl., Ex. R, E-mail. Tyson e-mails also show that Holmquist sent texts to his supervisor regarding August 9, 2016, and August 10, 2016. Filing No. 63-21, Reynold's Decl., Ex. T, E-mail at 2 (relating that on 8/9, "John texted at 4:40am he was going to be late" and on 8/10 "texted I'm out today boss I have a note").

The record shows Holmquist was seen by his orthopedic surgeon, Dr. John D. Ray on August 9, 2016, for "increased back pain with full activity at work" and was "at risk for adjacent segment problems in addition to failed fusion." Filing No. 67-5, Doctors' Notes at 3. Dr. Ray recommended that Holmquist "should have a little more autonomy in terms of saying no to specific activities" at work. *Id.* A doctor's note dated August 15, 2016, indicates that the plaintiff should be limited to working half days for the reminder of the month. Filing No. 67-5, Ex. Z, Doctors' notes at 2.

Mark Sarratt states that, after Holmquist "reportedly had failed to timely communicate with or respond to his supervisor on August 9, 2016 and August 10, 2016," he met with Holmquist on August 11, 2016, to "discuss his need to provide timely, and proper advance notification of his absences and tardies, and to do so on each day for which he needed to be absent or tardy, regardless of the reason." Filing No. 63-28, Declaration of Mark Sarratt ("Sarratt Decl.") at 1-2. Sarratt "specifically instructed [Holmquist] to call-in his absences or tardies on each day he could not report to work by his start time, to do so timely in advance of his shift, and to make personal contact with

certain individuals I identified for him in the meeting, including his direct supervisor, Juan Sanchez." *Id.* at 2. Holmquist was not formally disciplined for any failure to timely report on August 9, 2016, or August 10, 2016. *Id.* Sarratt states that Holmquist "failed to follow those directives to call-in before his shift as instructed on August 15, 2016" and Sarratt "made the decision to terminate Plaintiff's employment due to his failure to follow [Sarratt's] directives and to call-in as I had directed, and because he did not provide any excusable justification for this failure." *Id.* An e-mail from Sarratt to a superior at Tyson states:

> You may see a request to term on him. After I sat down with him on Thursday, I was very clear with him with expectations on communication, he didn't show up this morning until 11:30 with a Dr's note to work half days, he couldn't call in because the charging cord on his phone broke. If that's how he views his duties after I directed him, I don't need him here.

Filing No. 63-21, Ex. T, E-mail at 3. The superior responded, "I would agree, half days because of what?" *Id.* Suzanne Reynolds then wrote to another Tyson management employee requesting Holmquist's termination. *Id.* at 2. She related that she told Holmquist on August 15, 2016, that "we had two different issues here. 1. Was his continued failure to appropriately report his absences. 2. An accommodation for a non-occ issue. Those two things had absolutely nothing to do with each other. I suspended him pending disciplinary action." *Id.* at 2.

Tyson records show Holmquist attempted to provide documentation of restrictions and absences to Health Services on August 11, 2016. Filing No. 67-2, Medical Narrative at 4. Holmquist testified he again went to Health Services on August 15, 2016, with the doctor's note dated August 15, 2016, and spoke to Ms. Samoya. Filing No. 63-35, Washkun Decl., Ex. A, Holmquist Dep. at 243-44; *see also* Filing No. 63-23, Samoya Decl. at 5. He then took the note to Human Resources for accommodation, as required

8

by Tyson procedure. *Id.* Human Resources Manager Suzanne Reynolds suspended the plaintiff when he met with her about the restrictions. Filing No. 67-1, Ex. V, Holmquist Statement at 8. The plaintiff was terminated on August 19, 2016. Filing No. 63-22, Ex. U, Personnel Action.

II. LAW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.*

The ADA prohibits discrimination "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). In the absence of direct evidence of discrimination, courts evaluate an ADA wrongful termination claim under the familiar *McDonnell Douglas* framework. *Ryan v. Capital Contractors, Inc.*, 679 F.3d 772, 776–77 (8th Cir. 2012); *see also Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 228 (2015). To establish a prima facie case under the ADA, an employee must demonstrate that he or she: (1) is disabled

within the meaning of the ADA, (2) he or she was qualified to perform the essential functions of the job, and (3) that he or she suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination. *Ryan*, 679 F.3d at 777.

Under pre-ADAA law, temporary impairments with little or no long-term impact were not disabilities. *See Samuels v. Kansas City Mo. Sch. Dist.*, 437 F.3d 797, 802 (8th Cir. 2006). Since the amendments, the courts have construed "disability" more broadly. *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 756 (8th Cir. 2016); *Gardea v. JBS USA, LLC*, 915 F.3d 537, 541 (8th Cir. 2019); *see* 42 U.S.C. § 12102(4)(A) (stating "[t]he definition of disability in this chapter shall be construed in favor of broad coverage").

Once a plaintiff has established a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the employee's termination; if it does so, the burden shifts back to the employee to demonstrate that the employer's proffered reason is a pretext for unlawful discrimination. *Ryan*, 679 F.3d at 777. The Eighth Circuit Court of Appeals has "'consistently held that violating a company policy is a legitimate, non-discriminatory rationale for terminating an employee.'" *Id.* (quoting *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006) (citation omitted)). A plaintiff can demonstrate pretext various ways, including "showing than an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010). When demonstrating pretext by showing disparate treatment between similarly situated employees, but a plaintiff must

10

show that he and his comparator were similarly situated in all relevant respects. *Ryan*, 679 F.3d at 777.

The ADA also has elements similar to Title VII for any claim for retaliation. *Heisler*, 931 F.3d at 794–95. The initial burden is on the plaintiff to show (1) that he or she engaged in statutorily protected activity; (2) an adverse employment action was taken against him or her; and (3) a causal connection exists between the two events. *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1042–43 (8th Cir. 2007). Though the standard under the ADA naturally continues to include protected conduct like filing a complaint or participating in a hearing before the EEOC, it has also been interpreted to cover when an employee requests a reasonable accommodation and is subsequently discriminated against because of that request. *Heisler v. Metro. Council*, 339 F.3d 622, 632 (8th Cir. 2003) (stating that "requesting an accommodation is a protected activity") *see also Larsen v. Maynard, Inc.*, No. 5:18-CV-5093, 2019 WL 2774329, at *6 (W.D. Ark. July 2, 2019) (noting that "the recognition that requesting an accommodation qualifies as "protected activity" for purposes of an ADA retaliation claim has broadened the nature of the claims that can be asserted as retaliation claims and increased the likelihood that an ADA discrimination and ADA retaliation claim will look nearly identical in some contexts."). An employee may show the causal link based on the temporal relation of the protected activity and the adverse employment action. *See Smith v. Fairview Ridges Hosp.* 625 F.3d 1076, 1088 (8th Cir. 2010). "The mere coincidence of timing, however, is rarely sufficient to establish the causation element." *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 925 (8th Cir. 2014) (citation omitted). "Although [the Court of Appeals has] not

11

drawn a definitive line, [it has] determined that a one-month or two-month lag is too long absent other evidence." Id.

Discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual." 42 U.S.C. § 12112(b)(5)(A). The burden-shifting analysis also applies to a reasonable accommodation claim. Brunckhorst v. City of Oak Park Heights, 914 F.3d 1177, 1182 (8th Cir. 2019), reh'g denied (Mar. 21, 2019). If a plaintiff claims that he "could not perform the essential functions of his job without an accommodation, he must 'make a facial showing that reasonable accommodation is possible.'" Id. (quoting Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 950 (8th Cir. 1999). At that point, the burden of production shifts to the defendant to show that it is unable to accommodate the plaintiff. Id. A "plaintiff may reach a jury on this issue by providing sufficient evidence that the employer's policies impose a significant burden on [disabled] workers, and that the employer's 'legitimate, nondiscriminatory' reasons are not sufficiently strong to justify the burden, but rather—when considered along with the burden imposed—give rise to an inference of intentional discrimination. Young, 575 U.S. at 229.

"An accommodation is not reasonable if it requires an employer to 'reallocate or eliminate the essential functions of a job.'" Higgins v. Union Pac. R.R. Co., 931 F.3d 664, 671 (8th Cir. 2019)(quoting Faulkner v. Douglas Cty. Neb., 906 F.3d 728, 733 (8th Cir. 2018) (citation omitted)). The Eighth Circuit Court of Appeals "has consistently stated that 'regular and reliable attendance is a necessary element of most jobs.'" Greer v. Emerson Elec. Co., 185 F.3d 917, 921 (8th Cir. 1999) (quoting Nesser v. Trans World Airlines, Inc., 160 F.3d 442, 445 (8th Cir. 1998)); see also Lipp v. Cargill Meat Sols. Corp.,

911 F.3d 537, 545 (8th Cir. 2018) (involving 195 days of unplanned absences for both personal and medical reasons in less than a year); *Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961, 966 (8th Cir. 2006) (finding that a mechanic's 172 missed days in two years amounted to an inability to perform the job); *Buckles v. First Data Res., Inc.*, 176 F.3d 1098, 1102 (8th Cir. 1999) (finding numerous and unpredictable absences and an unfettered ability to leave work at any time is not a reasonable accommodation); *Pickens v. Soo Line R.R. Co.*, 264 F.3d 773, 778 (8th Cir. 2001) (finding employee's request to "work only when he feels like working . . . unreasonable as a matter of law").

III. DISCUSSION

The Court finds Tyson's motion for summary judgment on the plaintiff's disability discrimination claim should be denied. Tyson has not shown as a matter of law that it is entitled to judgment on the plaintiff's claims.

Viewing the evidence in the light most favorable to Holmquist, he has presented evidence that creates an issue of fact as to whether his recovery from surgery and attendant restrictions motivated Tyson to terminate him. The question for a jury to decide in this case is whether the defendant had a legitimate, non-discriminatory reason to fire Holmquist or whether the decision was motivated by plaintiff's disability. The evidence shows Tyson was aware of his back problem in December 2015 and granted him a six-week leave of absence for the surgery. He was thereafter restricted from bending, twisting, and lifting first 10, then 20, pounds and eventually 50 pounds. Though Tyson contends Holmquist did not follow proper procedures and channels for his work

restrictions, he testified he told his supervisors about the restrictions, and at this stage of the proceedings, the Court must credit that testimony.

The evidence suggests Tyson did not seriously implement restrictions of which his supervisors were aware, nor did it accommodate his request to be relieved of having to cover for particularly strenuous jobs on the kill floor. There is some evidence that Tyson treated Holmquist differently than another supervisor with medical restrictions.

Also, it does not appear that Tyson followed its own absence or accommodation policies. Though there is evidence in the record that Holmquist had been disciplined in the past, the violations do not appear to be particularly serious (for example failure to provide a hearing test) and discipline for unexcused absences appears to have been remedied by doctors' notes. The plaintiff was disciplined for missing two mandatory meetings over the course of three years. In short, there is evidence in the record from which a jury could reasonably infer that Tyson's purported reason for terminating Holmquist was a pretext for disability discrimination.

Viewing the evidence in the light most favorable to Holmquist, he has satisfied his burden of showing there are genuine issues for trial. The record shows conflicts and disagreements between the plaintiff and his supervisors regarding the level of exertion expected of Holmquist when subbing for others on the kill floor. Holmquist contends that his supervisors knew of and informally accommodated his restrictions, to some extent. He contends he furnished the doctor's restrictions to Tyson representatives and Tyson admits it had proof of restrictions on July 15, 2016, that dated back to June 16, 2016. The evidence of record creates a classic issue of fact and the outcome will depend on whose testimony is credited.

Although Tyson contends that it accommodated the plaintiff, the record does not provide evidence that the accommodations were ever put into practice. Holmquist was suspended at the same time he asked for the reduction-in-hours accommodation. There is no evidence that Tyson representatives participated in any interactive or collaborative discussion of the feasibility of the requested restrictions, and no showing that it would have been unduly burdensome for Tyson to provide a temporary reduction in hours. The evidence that supervisors and other employees covered for each other on the production line, at least suggests that there was some flexibility and amounts to a facial showing by Holmquist that the accommodation was possible. This case is qualitatively different that those cases that have found requested accommodations involving absences and reduction in hours unreasonable as a matter of law. *See, e.g., Lipp*, 911 F.3d at 545 (195 absences); *Schierhoff,* 444 F.3d at 966 (172 missed days); *Buckles*, 176 F.3d at 102 involving a request to leave work any time chemicals were present); *and Pickens*, 264 F.3d at 778 (involving a request to work only when the employee felt like it). The plaintiff requested only a temporary reduction of daily hours for a relatively short period of time. Tyson has not shown that it is entitled to judgment as a matter of law on the plaintiff's failure-to-accommodate claims.

The plaintiff's retaliation claim is premised on the exercise of his right to request a reasonable accommodation. The timing of the termination, close on the heels of the request for a reduction in hours, gives some credence to the claim. The record, viewed in the light favorable to Holmquist, supports a conclusion that Tyson suspended and terminated the plaintiff because he had requested accommodations. The e-mail colloquies between and among Tyson managerial personnel provide some evidence of a

discriminatory animus in that management acknowledged that 2 issues—the absence policy/call in procedure and the reasonableness of a requested accommodation—were both at play. Although the Human Resources manager stated that the two issues had nothing to do with each other, a jury could find that the arguably legitimate rationale of failure to follow an order functioned as a pretext for a termination actually motivated by the company's reluctance to accommodate the plaintiff's post-surgical restrictions. Whether the requested accommodations were reasonable is a matter of dispute. The Court is unable to make these determinations without an assessment of credibility.

Tyson's reliance on Holmquist's failure to call in and excessive absences as a legitimate and nondiscriminatory reason for the termination is suspect in that Tyson had allowed the absences with a later-provided doctor's note, and there is conflicting evidence as to whether or when Holmquist informed his supervisors of his needs for time-off. Also, a jury could conclude that the plaintiff's absences and need for doctor's appointments were not excessive but were reasonable as a follow-up to the surgery. As far as failing to follow an order, there is some question as to what motivated Tyson to place call-in obligations on the plaintiff that exceeded those in its written policy.

Similarly, the evidence of Tyson's Human Resources policies and Holmquist's acknowledged awareness of the policies is not particularly probative in the absence of evidence that they were uniformly applied and routinely followed. The evidence suggests the contrary. Here, Tyson maintained a written attendance policy and enforced its policy with a system of progressive discipline, culminating in termination after accruing fourteen points. There is no evidence that Tyson followed the policy in Holmquist's case. Further, it has not established that it followed its interactive disability accommodation procedure.

Viewing the evidence in the light most favorable to Holmquist, he has presented evidence from which a reasonable jury could find that he was terminated because of a disability, as that term is defined in the 2008 amendments to the ADA. Tyson was clearly aware of his back surgery. Viewing the evidence in the light most favorable to Tyson, he has presented evidence that creates an issue of fact as to whether his post-surgery restrictions caused his suspension or termination. Holmquist has presented evidence of derogatory comments in the workplace that are sufficient to support the inference by a reasonable fact finder that his disability and request for accommodations motivated Tyson's conduct.

Holmquist has presented evidence of genuine issues of material fact on the elements of his disability discrimination, failure to accommodate, and retaliation claims. The defendant has not established that it is entitled, as a matter of law, to a summary judgment in its favor. Accordingly,

IT IS ORDERED:

1. Defendant's motion for summary judgment (Filing No. 60) is denied.

DATED this 15th day of April, 2020.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge